UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

**UNITED STATES** OF AMERICA,
    *Plaintiff,*

v.              Case 1:**15-cr-**00**214-**MV

**GERALD JAMES VIARRIAL,**
    *Defendant.*

**RESPONSE TO MOTION FOR UPWARD VARIANCE/DEPARTURE OBJECTIONS TO PRESENTENCE REPORT AND DEFENDANT'S SENTENCING MEMORANDUM**

IN RESPONSE to *United States' Sentencing Memorandum and Motion for Upward Variance/Departure* (Motion dated 9 Jan 2017, doc 123) and the Pre-Sentence Report (PSR, doc 120), defendant submits the following sentencing memorandum:

1. On behalf of the United States, Assistant US Attorney Nayback states no objection in its Motion to the PSR but, instead of its total guideline range of 192 to 204 months, seeks an upward departure or variance to 240 months. Motion at page 1.

2. On 22 July 2015, however, Mr. Nayback offered a plea agreement to an assault charge and stated the "guidelines would probably come out at around 30 months but this plea would allow you and your client to request a variance

downward to a time-served sentence."[1] The rationale for an increase of eighteen (18) years, or 800%, are factors known to the prosecution from the outset.

3.  **Acceptance of Responsibility**. One unstated factor did arise afterwards: plea negotiations broke down and Mr. Viarrial exercised his constitutional right to trial by jury. The Sentencing Guidelines do not suggest an increase when the defendant loses at trial. Rather, the guidelines contemplate the trial court exercising its discretion by denying a two-level reduction for acceptance of responsibility. *United States v. Dazey*, 403 F.3d 1147, 1172 (10th Cir 2005); *see also* USSG. §3E1.1 cmt. n. 1 (the acceptance-of-responsibility adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt and is convicted").

4.  **Extreme Injury/Conduct**. For the legal basis of this upward departure, the prosecution cites USSG §§5K2.3 (Extreme Psychological Injury) and §5K2.8 (Extreme Conduct). Motion p. 5.

5.  The record must support the factual basis for departure. *United States v. Begaye*, 635 F.3d 456 (10th Cir 2011) *citing United States v. Robertson*, 568 F.3d

---

1  Hotchkiss email, Attachment 1. Although settlement negotiations are not admissible at trial to prove liability under Fed. R. Evid 408, they are admissible in a criminal case regarding sentencing considerations. *United States v. Graham,* 91 F.3d 213, 218-219 (DC Cir 1996) citing Fed.R.Evid 410 and Fed.R.Crim.Pro. 11(e)(6). *See also United States v. Bailey*, 327 F.3d 1131, 1146 (10th Cir 2003)("Rule 408 specifically states that it 'does not require exclusion when the evidence is offered for another purpose'").

1203, 1211 (10th Cir 2009). The prosecution has not attempted to demonstrate that the victims "suffered psychological injury much more serious than that normally resulting from commission of the offense." *Begay*, 635 F.3d at 472 n. 4 *quoting* the policy statement to sec. 5K2.3. In *United States v. Fawbush*, 946 F.2d 584, (8th Cir 1991), the Eighth Circuit found inadequate evidence that the victims suffered psychological injury greater than normal absent psychiatric testimony, the only evidence presented was that one victim "has been participating and continues to participate in individual group and family therapy." *Fawbush*, 946 F.2d at 586, n. 2, *cited in Begay*,[2] 635 F.3d at 464; *see also United States v. Okane*, 52 F.3d 828 (10th Cir 1995).

6. The prosecution, however, does not object to the findings in the PSR, including "Victim Impact: The United States Probation Office met with the victims of the case. At this time, the victims are not requesting restitution. Jane Doe indicated the prolonged abuse on the family effected them all in various ways to include issues with school; however, since the defendant has been in custody **the family has been able to move on and put the past behind them.**" PSR p. 10, par. 26 (emphasis added) *quoted* in Motion at p. 4. *See also*

---

[2] In *Begaye*, the defendant forced sexual intercourse upon his daughter ever since the first grade. "The record is rife with evidence of the extreme nature of Ja.B.'s psychological injuries. At sentencing, the district court had before it multiple professional assessments—uncontested by Mr. Begaye—diagnosing Ja.B. with post-traumatic stress disorder and chronic anxiety, and indicating that she suffered from recurrent dreams and hallucinations that required medication. As a result of her trauma, Ja.B., according to one professional, "was not oriented for person, place and time." R., Supp. Vol. V, at 80 (Mental Health Assessment, dated Apr. 2, 2008). Another described her as "fearfully dependent, socially anxious, and protectively sad." 635 F.3d at 465.

PSR at par. 160 (an upward departure for extreme psychological injury and extreme conduct "would have no impact on his guideline range and is not recommended"); discovery 483 lines 5-9, Safehouse Interview of John Doe 2 ("Are you worried about that happening? A. I don't know. I mean, like he says stuff but I don't think he'll do it").

7. **Criminal History.** The prosecution cites *United States v. Benally*, 756 F.2d 773, 779 (10th Cir 1985), for the proposition that the district court can consider prior tribal court convictions in sentencing on a later federal conviction despite the fact that such tribal court convictions were uncounseled and resulted in prison time." Motion at p. 6. The defendant was often not convicted in his tribal court arrest and his misdemeanor convictions never resulted in prison time. He was one of three teenagers on the pueblo who were often arrested by relatives on the police force on suspicion of misconduct only to be released the following day. There are instances of defendant being intoxicated and belligerent [PSR par. 72], but again misdemeanor misconduct cannot change the zero criminal history unlike prior felonies.[3]

---

3  The PSR cites a conviction off the reservation for possession of marijuana. PSR par. 80. This 1986 petty misdemeanor was expunged from defendant's record after ten years. In PSR 87, the alleged victim told Judge Denali that his mother had told him to lie about his father and the charges were dismissed.

8. The PSR also suggests under-representation of defendant's criminal history. PSR par. 159. However "an upward departure would have no impact on his guideline range and is not recommended." Id.

9. **Perjury**. The probation officer does seek a two level increase for perjury. PSR par. 33 ("his denial of guilt under oath constitutes perjury as the jury did not believe his denial of guilt").

10. "Not every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury." *United States v. Dunnigan*, 507 U.S. 87, 95 (1993). Perjury takes place only when the defendant "witness testifying under oath or affirmation . . . gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. 87 at 94 *citing* 18 U.S.C. §1621. The district court must independently find "(1) a false statement under oath, (2) concerning a material matter, (3) with the willful intent to provide false testimony." *United States v. Hawthorne*, 316 F.3d 1140, 1146 (10th Cir 2003) *citing Dunnigan*, 507 U.S. at 94.

11. "The Tenth Circuit's standards are stricter than those expressed in Dunnigan." *United States v. Hawthorne*, 316 F.3d 1140, 1145 (10th Cir 2003)

("[w]e require that [the district] court be explicit about which representations by the defendant constitute perjury").

12. The defendant turned down a plea offer involving time served not because he intended to commit perjury, but because he honestly believes he has been a loving father raising his children,[4] and that he was never afforded an opportunity to rebut testimony that had more to do about custody than criminality. Given defendant's psychiatric and physical impairments, the prosecution cannot rule out the possibility of confusion, mistake and faulty memory caused by the emotional injury from the murders of his brother and teen-aged son, profound physical injuries to his skull, and diagnosed but untreated psychiatric impairments.

13. At paragraph 10, John Does I discusses rat poop and the children's bedding. These are separate matters. Mice did leave droppings in the garage. Discovery 491 ("his garage … has like rat poop and stuff") but none of the items in the garage were used for bedding.

14. The defendant only had his children on Sunday, Monday, Tuesday and Wednesday night at 10:00 pm. when their mother went to work. He kept them

---

4  John Doe 2, Safehouse Video: "he made us go and ride the horse." Discovery 481 line 20-21. "He made us hold a cow and stuff to cut his balls off." Discovery 483. This is the procedure for all cows on pueblo lands. "He kept me hostage inside the house cleaning and stuff, made me clean, mop his whole house." Discovery 495, Safehouse Interview lines 21-23; 512, lines 18-23 ("He says like – no, not physical … Mostly just that, the yelling and the work").

overnight, fed them breakfast and took them to school in the morning. In the afternoon after school, she picked them up and kept them until she left for work and all day and night on Thursday, Friday and Saturday. Discovery 514 lines 23-25 ("the only reason we were with him is because like she had worked those nights, Sunday, Monday, Tuesday and Wednesday"); see also John Doe 1, discovery 40 (Sunday until Wednesday). Unlike the chronic truancy before this arrangement, the children had perfect or near perfect attendance because each school morning he took them to the McDonald's playground and then to school on time.

15. When asked "tell me what was horrible," John Doe 2 said "just like the yelling and the work." Discovery 480 line 24. "There's like lecturing. There's work. Yeah, it's like mostly those." Discovery 486 lines 20-21. Safehouse transcript of John Doe 2 ("he hit us when were were little and stuff but he know better not to do it now because we'll hit back or something"); 519 line 10-11 (Q. violence with them and dad? A. Not recently")' 520 (he hit us when we were younger but I don't remember that much because I was little"); Id ("How about your brothers or sisters? A. No, just that time he choked [JD1]") . The children preferred to be with their mother because she allowed them to ditch school and did not assign chores around the house.

16. The alleged victims denied in police statements that defendant hit them, "just yelling." John Doe 1, Discovery page 524 lines 9-16 ("just like the abuse, like the yelling and stuff like that…And like he spitted on my brother … like he was spitting on them when he was talking, like he was all spitting on them"); 434 ("the next day when I reported it he like went and choked me. Q. He was going to kill you? A. Choke me. Q. Choke you. Did he choke you? A. He tried"). John Doe 1 then admitted that he was not touched: "He just went over there and – and just put his hand (inaudible) **he like made a fist like he was going to punch me or something**." Discovery 466-467 (emphasis added); 468 ("And what happened then? A. Then he – then he stopped. Q. He stopped. What made him stop? A. I don't know, he just stopped all of a sudden"); Id. (And how about your body, how did your body feel? A. Scared. Q. Scared, okay. Scared and sad. And how about pain-wise was there any pain A. Un -huh. Q. No, okay. Anything else? Like were you breathing okay? A. Uh-huh."); 469 ("Q. like choking or anything like that? A. No"); see also Discovery 435 ("Q. Did he squeeze your hard? A. Like a little bit. Q. Did it leave any marks? No. Did you did it hurt. A. Like I don't know, he was like, I don't know, he was like going to choke me more but and then said said something").[5]

---

5  John Doe 1 was asked if it happened, the choking, one time or more than once. "Just – just like one time." Discovery 464. At the safehouse video he stated "he *tried choking me*" and "*tried punching me.*" Discovery 460 lines 9, 13 (emphasis added).

17. At paragraphs 11 and 15 the officer complains that defendant made Jane Doe buy a gun. See also PSR 16 ("she had purchased guns for him under duress of being killed if she refused"). The defendant's oldest son was fatally shot by gang members and there were threats on his life. As a result he taught Jane Doe and his children basic gun safety skills to defend themselves if something were to happen.

18. At paragraph 20, defendant took his children to the dermatologist for their skin conditions and paid for the treatment. E.V. never said she was punched in the stomach and the trial testimony was that never happened.

19. At paragraph 30, the officer seeks a two-level enhancement because "defendant forced Jane Doe to stand in line for approximately 15 minutes while he continued to make threats upon her life." However, John Doe 1 was asked "how long were you guys standing like that? A. (inaudible) a couple of minutes, I think. **Like a minute or something**." Discovery 433 lines 12-15.[6]

20. Jane Doe, according to the officer at paragraph 30, was holding the baby and was physically restrained. According to E.V. and J.V., their mother was sitting a quarter of a mile inside the car with the small children when the alleged assault took place. Lieutenant Johnson testified that the reason no one

---

6  They stood in a line while firing at a picture of the person who killed defendant's oldest son not out of punishment but safety because the children were running in front of the firing line.

saw the defendant brandishing a gun was because there were in a line looking away from him.

21. At paragraph 88, the Governor and Lieutenant Governor deny any wrongdoing by defendant.

22. At paragraph 92, defendant maintains a good relationship with all of his sisters except Teresa who he has not seen for 30 years. John Doe said "he kept yelling at us and accusing us and telling us what to do." Discovery 450. Defendant was yelling at his children about their excuses for ditching school. He did require chores in the house as his ancestors have done for years.

23. At paragraph 95, the misconduct by defendant's uncle was not due to a dispute over land ownership on the pueblo.

24. At paragraph 101, defendant took care of Jane Doe's father for over twenty years.

25. At paragraph 107, the diagnosis of esophageal cancer was first made in 1990, not 2000. He has had two or three umbilical hernias.

26. At paragraph 108, he broke his back in five places when he fell off the horse in 2006.[7] The bull kicked him in the head approximately ten times.

---

7  Despite the medical records, his son told the investigator that when he felt his father's back he felt "like nothing" was wrong. Discovery 553 line 8.

27. At paragraph 109, he was climbing a cliff at the age of 19 which was reckless but not suicidal.

28. At paragraph 111, they took turns kicking his head and hitting his head with the butt of a rifle. The correct number of stitches to his head on 10 April 1994 was two hundred seventy one (271), not "27 stitches to the head."

29. The PSR states that records indicate that "the defendant was never seen at [Santa Fe Sage Counseling]." PSR par. 112. In 1983, however, he received psychiatric counseling there for several months.

30. In paragraph 113, the defendant signed all of the releases presented to him and his counsel regarding treatment at UNM psychiatric services.

31. At paragraph 115, the defendant received Prozac for the diagnosed anxiety disorder, depression and PTSD.

32. At paragraph 157, the probation officer does not believe that the disabilities outlined by Dr. Westfried "are presented to an unusual degree and distinguish the cases from the typical cases covered by the guidelines." USSG 5H1.3. The probation officer correctly notes the probability " that the effect of [defendant's] cognitive and emotional problems was to impair his ability to problem solve/engage in adequate reasoning as well as to control his behavior at the time of the instant offenses. The defendant's mental status examination

indicated some possible cognitive difficulties and there were signs as well as symptoms of both a major depressive disorder and a post-traumatic stress disorder." PSR par. 118; see Doc 120-2 (Westfried Report). Neither the prosecution nor the probation officer present any competent medical or psychiatric evidence to minimize these psychological deficits, and the prosecution does not even address this pressure for a downward variance.

33. That the one head injury involved 271 stitches, not 27 as reported by the probation officer, is but one example of how the defendant's impairment is profound and should be considered in mitigation and extenuation of his offense level.

34. In *United States v. Sayad*, 589 F.3d 1110 (10th Cir 2009), the Tenth Circuit found reliance upon a defendant's mental and physical condition to be appropriate for downward variances. District courts are granted wide discretion in choosing which factors to rely on in determining whether a variance is justified under § 3553(a), and may rely on factors disfavored by the Sentencing Commission. *Sayat*, 589 F.3d at 1120, n. 4, *citing Gall v. United States*, 552 U.S. 38, 57-59; *United States v. Pinson*, 542 F.3d 822, 838-39 (10th Cir 2008); and *United States v. Munoz-Nava*, 524 F.3d 1137, 1148 & n. 6 (10th Cir 2008) ("A

factor's disfavor by the Guidelines ... no longer excludes it from consideration under § 3553(a)").

35. In paragraph 160, the officer states that "whenever Jane Doe brought the children food, the defendant fed it to the dogs." That is incorrect. Jane Doe brought the children over at 10:00 pm. on her way to work. On one occasion, not more than once, the children had brought a box of food over from McDonald's after dinner but they left it in the kitchen instead of putting it in the refrigerator when they went to bed. In the morning the defendant considered the food unsafe to eat and gave it to the dogs.

36. Also at paragraph 160 the officer states "there was never any food in the home," Defendant received the children at bedtime but fed them in the morning. In one safehouse interview, a child complained "Q. does he ever give you any food? A. Like eggs. Q. Like eggs? A. But they're chicken eggs." Discovery 548 lines 12-23 (14-15 chickens). The child has been convinced that it was wrong to be served eggs *from chickens*, but she was well fed nonetheless. She also complained that the older children had to cook the eggs and the tamales and the soup.

WHEREFORE defendant requests that the court:

A. Deny the motion for upward departure;

 B. Grant a downward variance to the statutory minimum seven (7) years as sufficient punishment based upon defendant's physical and psychiatric issues, and his underlying if misguided love for his children; and,

 C. Grant such further relief as justice requires.

        Stephen D Aarons
        Counsel for Defendant
        311 Montezuma Ave
        Santa Fé NM 87501
        505/984-1100; Fax: 505/984-1110

<u>Certificate of Service</u>

On the date of filing, an electronic copy of this pleading was automatically sent by the Electronic Management/Electronic Case Files (EM/ECF) system to opposing counsel of record.

        Stephen D Aarons
        Defense Counsel